## UNITED STATES *v.* HIAWASSEE LUMBER COMPANY.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 133.   Argued March 2, 1915.—Decided June 21, 1915.

In an action of ejectment brought by the United States to recover a tract of land in North Carolina, the result depended upon the validity of the probate and registration of the deeds under which the Government claimed title, and after reviewing and construing the various statutes of the State regulating such probate and registration, *held* (a) that the deed to the grantor of the United States, made in 1868, was validated as to probate and registration by an act of January 27, 1870; and (b) that the deed from this grantor to the United States, made in 1869, was admitted to registration, without limitation as to time, by force of the Connor Act of 1885 of North Carolina, and when so registered was made valid to pass title by the terms of the same act.

202 Fed. Rep. 35, reversed.

THIS was an action of ejectment brought by the United States against the Hiawassee Lumber Company in the Circuit Court of the United States for the Western District of North Carolina to recover a tract of land situate in Clay County, in that District and State, described as

follows: "Grant No. three thousand, one hundred and ten, containing five thousand acres, and beginning at a chestnut on the top of Tusquita Ball [Tusquita Bald] on the Mason County Line, and runs east three hundred and twenty poles to a chestnut on a mountain side, thence south seven hundred poles to a pine, thence west twelve hundred and forty poles to a stake, thence north seven hundred poles to a stake and hickory, thence east nine hundred and twenty poles to the beginning." Defendant's answer denied generally the allegations of the complaint, set up possession and title in itself to a part of the tract, and demanded judgment that it was the owner and entitled to the possession of said land. The trial court directed a verdict in favor of defendant, and the resulting judgment was affirmed by the Circuit Court of Appeals (202 Fed. Rep. 35).

From the bill of exceptions it appears that both parties claim under one Edwin B. Olmsted, who derived title to the lands from the State of North Carolina by certain grants dated November 10, 1867. One of these is Grant No. 3110, for 5,000 acres, described as in plaintiff's declaration. There are 16 other grants, each for 640 acres, the tracts adjoining each other in such manner as to form a quadrangle that admittedly includes the land claimed by plaintiff as well as much land besides. Plaintiff claims through deeds purporting to convey the 5,000 acre tract as described in Grant No. 3110. Defendant claims under a series of conveyances purporting to convey the 16 tracts of 640 acres each. So far as the bill of exceptions shows, there was no evidence of possession on either side, and the question turns upon the paper titles.

Plaintiff's chain of title is made up of the 17 grants to Olmsted and two deeds of conveyance. The first deed is dated February 7, 1868, made by Edwin B. Olmsted and wife, of the City of Washington, District of Columbia, to Levi Stevens, of the same City and District, pur-

porting to convey the 5,000 acre tract in question. It was acknowledged in due form on the day of its date in the District of Columbia by Olmsted and wife (she being privately examined), before John S. Hollingshead, a commissioner for the State of North Carolina in and for the District of Columbia. Besides the certificate of acknowledgment, it bears the following indorsements: (a) One showing that it was recorded December 14, 1868, in the land records for Cherokee County; but this may be disregarded, since it is not questioned that the lands described in the deed lie in Clay County, which was formed out of a portion of Cherokee in the year 1861. (b) Next is a certificate by the Register of Clay County that the deed was "duly registered in the register's office of Clay County" on February 23, 1869, mentioning the book and page. (c) Next is a certificate dated May 20, 1896, made by the clerk of the Superior Court of Clay County, stating that the certificate of Hollingshead, commissioner, "having been exhibited before me with the seal of his office attached, the same is adjudged to be in due form and according to law. Therefore let the foregoing instrument with all the certificates be registered." And, finally, there is a certificate of the registration of the deed on May 20, 1896, in Clay County.

The second deed is dated March 15, 1869, made by Stevens and wife, of Washington, D. C., to the United States, purporting to convey certain tracts granted by the State of North Carolina to E. B. Olmsted November 10, 1867, and describing 45 different tracts, one of which is the 5,000 acre tract in question. This was duly acknowledged by Stevens and wife before a commissioner for the State of North Carolina in and for the State of Pennsylvania on March 15, 1869. It was registered in Cherokee County August 4, 1871; but this is immaterial so far as its effect upon the lands in Clay County is con-

cerned. It was not registered in the latter county until May 20, 1896, and it was then registered after compliance with all the requirements of law.

Testimony was introduced on both sides upon the question of location; a map was introduced purporting to show the location of the 5,000 acre tract, and of the sixteen 640 acre tracts; it was testified that the former was located by an actual survey beginning at a chestnut on the Tusquita Bald, in the Mason County line, as indicated by the description and the map; and it was admitted that there was evidence sufficient to go to the jury as to the location.

Defendant claimed to derive title from Olmsted through, first, a decree of the Superior Court of Mason County, North Carolina, in an equity action brought by one Swepson against Olmsted in the year 1882, resulting in a deed of conveyance, made pursuant to the decree and order of the court, by Kope Elias, Commissioner, to A. Rosenthal, dated October 28, 1882, and duly registered in Clay County October 17, 1890; secondly, a quitclaim deed from Olmsted and wife to Rosenthal, dated October 31, 1882, registered in Clay County November 12, 1906, quitclaiming all interest of the grantors in the lands described in the Kope Elias deed; and, thirdly, certain special proceedings in the Superior Court of Alamance County, North Carolina, taken by the executrix of Swepson in the year 1884 for the sale of Swepson's "equitable and legal real estate," which resulted in a deed made by order of the court from Swepson's executrix to Rufus Y. McAden, dated May 11, 1888, duly registered in Clay County June 28, in the same year. Both the Kope Elias deed and the deed from Swepson's executrix to McAden purport to convey some interest in the 16 grants of 640 acres each. Other deeds were introduced to show that whatever estate or interest was conveyed by the deeds specified had become vested in defendant.

*Mr. Assistant Attorney General Knaebel*, with whom *Mr. S. W. Williams* was on the brief, for the United States.

*Mr. Marshall W. Bell* and *Mr. James H. Merrimon* for defendant in error.

MR. JUSTICE PITNEY, after making the foregoing statement, delivered the opinion of the court.

In order to simplify matters, we will dispose at the outset of a point that was ruled by the Circuit Court of Appeals in favor of plaintiff in error. As tending to sustain the ruling of the trial judge in directing a verdict for defendant, it was and is insisted that the 640 acre grants which figure in defendant's chain of title have priority over the 5,000 acre grant to which the deeds in plaintiff's chain of title refer. It is said that the lands were entered under the Cherokee land law, Laws 1852, chap. 169; Code of 1883, §§ 2464, *et seq.*; that the 5,000 acre grant is invalid for non-compliance with certain formalities prescribed by the law, and that even if valid it is subordinate to the 16 grants of 640 acres each, because, as is said, grants of this nature have effect according to the dates of the respective land entries, and the 16 grants were based upon entries antedating that upon which the 5,000 acre grant rests. We do not stop to examine the statutes upon which this contention rests, because we agree with the Court of Appeals that it is quite immaterial whether the 5,000 acre grant, independently considered, was valid or invalid. It is admitted that the 16 grants cover the same land, and all the grants were made to the same grantee upon the same day. It results that, in one mode or another, Olmsted on that day acquired the title of the State of North Carolina to the 5,000 acres. His deed to Stevens described that tract by its metes and bounds, as well as by reference to the grant number. If that deed is otherwise valid as

against defendant it conveys his title to the tract thus
described, whether that title was derived from the State
through Grant No. 3110 or through the other 16 grants.

The principal controversy turns upon the probate and
registration of the deed from Olmsted to Stevens. The
trial court held that under the laws of North Carolina
the registration of 1869 was invalid as notice or for any
purpose, but admitted in evidence the registration of 1896.
The direction of a verdict in favor of defendant was based
upon the theory that because the deed from Kope Elias,
Commissioner, to Rosenthal was registered prior to the
registration in 1896 of the deed from Olmsted to Stevens,
Rosenthal thereby acquired the legal title as a purchaser
for value without notice, and that his rights and the rights
of those claiming under him were not affected by the regis-
tration of the Olmsted and Stevens deeds in the year 1896.
The Circuit Court of Appeals, apparently deeming that
there was no distinction, so far as registration was con-
cerned, between the status of the Olmsted-Stevens deed
and that of the deed made by Stevens to the United States;
considered the question with respect to the latter deed,
and, finding that its registration prior to 1896 (erroneously
assumed to have been made in Clay County in 1871), was
not valid, and no title passed thereby, concluded that the
same was true of the registration of the Olmsted-Stevens
deed in Clay County in the year 1869. But it so happens
that between the acknowledgment of the Olmsted deed
in February, 1868, and the acknowledgment of the
Stevens deed in March, 1869, the law of North Carolina
was changed in a material respect; and, for this and other
reasons that will appear, we deem it proper to consider
the earlier deed first.

The deed from Olmsted to Stevens was dated and
acknowledged February 7, 1868. At that time the pro-
visions of law governing the acknowledgment, proof, and
registration of deeds were those found in Rev. Code 1855,

chap. 37, "Deeds and Conveyances," and chap. 21, "Commissioners of Affidavits and Probate of Deeds." We set forth the material portions in the margin.[1]

---

[1] REVISED CODE, 1855.

CHAPTER 37.

1. No conveyance for land shall be good and available in law, unless the same shall be acknowledged by the grantor, or proved on oath by one or more witnesses in the manner hereinafter directed, and registered in the county where the land shall lie, within two years after the date of the said deed; and all deeds so executed and registered shall be valid, and pass estates in land, without livery of seizin, attornment, or other ceremony whatever. ·

2. All deeds, . . . and other instruments of writing required or allowed to be registered, may be admitted to registration in the proper county, upon being acknowledged by the grantor, or proved on oath before one of the judges of the supreme or superior court, or in the county court of the county where the land or estate is situate, unless otherwise directed, or before the clerk of such court, or his deputy. *Provided,* that nothing herein contained shall be construed to allow the privy examination of *femes covert* to be taken otherwise, than by law is specially directed.

*         *         *         *         *         *         *         *

4. When any person shall desire to have registered any such deed [if the grantor or subscribing witness be beyond the limits of the State] . . . the court of pleas and quarter sessions . . . may issue a commission . . . to a commissioner or commissioners, authorizing any one or more of them to take the acknowledgment of the parties, or the examination of any one of the subscribing witnesses thereto, or other due proof thereof; and also the examination of any *feme covert* party to the same; and the proceedings of the commissioners, so authorized, being returned to the court, the court may proceed to adjudge that such deed or other instrument of writing is duly acknowledged or proved, and that the said examination is in due form: and thereupon the same, with the said proceedings, shall be registered; and such registration shall have the same effect as if the proceedings had been in open court.

5. When any deed conveying lands in this State . . . shall have been executed by any person, and it may be desired to take the probate or acknowledgment thereof out of this State, but within the United States, and the same shall be personally acknowledged by the person executing the same . . . before some one of the judges of

There is no question that the Olmsted deed was duly and properly acknowledged before a North Carolina commissioner in the District of Columbia, and the acknowledgment duly certified by him; so that, under the law as it then stood, upon the presentation of the deed with the accompanying certificate to the court of pleas and quarter sessions of Clay County, or to one of the judges of the Supreme Court or of the Superior Courts of North Carolina, a fiat for its registration would have followed, as of course.

---

supreme jurisdiction, or a judge of the courts of law of superior jurisdiction within the State, Territory, or district where the parties may be,—and if any of the parties shall be a *feme covert* and she shall be privily examined by such judge, whether she doth voluntarily assent thereto— . . . Or when such deed, . . . or other instrument as aforesaid shall be so acknowledged or proved, and the privy examination taken as aforesaid, before any commissioners appointed by the governor of this State, according to law, and duly certified by him, such deed . . . or other instrument, being exhibited in the court of pleas and quarter sessions of the county where the property is situate, or to one of the judges of the supreme court or of the superior courts of this State, *shall be ordered to be registered with the certificates thereto annexed; and the same being registered in the county wherein the property may be situate, pursuant to such order . . . shall be valid in law for the purpose intended thereby, and shall be received in evidence in any court without further proof.*

Chapter 21.

\* \* \* \* \* \* \* \*

2. The governor is hereby authorized to appoint and commission one or more commissioners in such of the States of the United States, or in the District of Columbia, or any of the territories, as he may deem expedient, who shall continue in office during the pleasure of the governor, and shall have authority to take the acknowledgment or proof of any deed, mortgage, or other conveyance of lands, tenements, or hereditaments lying in this State, and to take the private examination of married women, parties thereto, or any other writings to be used in this State. And such acknowledgment or proof, taken or made in the manner directed by the laws of this State, and certified by the commissioner, *shall have the same force and effect, for all purposes, as if the same had been made or taken before any competent authority in this State.*"

After the deed was acknowledged, but before it was registered, the change to which we have referred was produced by the adoption of the Code of Civil Procedure in the month of August, 1868. Of that Code, Title XIX applies to Probate Courts, and its second chapter relates to the Probate of Deeds.[1] It required that deeds conveying lands in the State "must be offered for probate, or a certified probate thereof must be exhibited before the Judge of Probate of the county, in which the real estate is situated," and it applied this to deeds acknowledged before North Carolina commissioners in other States or in the District of Columbia, at the same time requiring an adjudication that the deed was duly acknowledged, etc.

The query at once arises, whether this act can be fairly construed to apply to deeds previously executed and acknowledged in accordance with the requirements of the prior law. The Act is a Code of Civil Procedure, and § 429 prescribes the *mode* in which the probate of deeds shall be made and the certified probate thereof passed upon. There is nothing in this section, nor, so far as we

---

[1] CODE OF CIVIL PROCEDURE, 1868.

PROBATE OF DEEDS.

§ 429. How made.

All deeds conveying lands in this State  .  .  .  must be offered for probate, or a certified probate thereof must be exhibited before the Judge of Probate of the county, in which the real estate is situated, in the manner following;  .  .  .  .

4. Where the acknowledgment or proof of any deed or other instrument is taken or made, in the manner directed by the laws of this State, before any commissioner of affidavits for the State of North Carolina, appointed by the Governor thereof, in any of the States or territories of the United States or in the District of Columbia; and where such acknowledgment or proof is certified by such commissioner, *the Judge of Probate, having jurisdiction, upon the same being exhibited to him, shall adjudge such deed or other instrument to be duly acknowledged or proved in the same manner as if made or taken before him.*

have observed, is there anything in the Act of which it
forms a part, that attempts expressly to regulate or impose
conditions upon the registration of deeds or other instru-
ments.   We are referred to no decision by the courts of
North Carolina that makes the new procedure a condition
precedent to registration of a deed previously made and
acknowledged and thereafter registered within two years
after its date, pursuant to Rev. Code 1855, chap. 37, § 1.

But we deem it unnecessary to pass upon the question
here suggested, for reasons that will presently appear.

It will be observed that in the Code of 1855 a very dif-
ferent effect was given by § 5 of chapter 37 to a certificate
of acknowledgment taken by one of the commissioners
appointed by the Governor under Chapter 21, from the
effect given to the proceedings of a commissioner or com-
missioners specially appointed under § 4 of chapter 37.
Proceedings before a special commissioner, being returned
to the court, simply formed the basis upon which the
court might proceed to adjudge that the deed was duly
acknowledged or proved.   But an acknowledgment taken
by a standing commissioner (an official commissioned by
the Governor and holding office during his pleasure), being
duly certified, was not to be reviewed judicially before
being ordered to registration.   So it was expressly held
by the Supreme Court of North Carolina in *Johnson* v.
*Lumber Co.* (1908), 147 N. Car. 249, 251.   And see, to the
same effect, *Cozad* v. *McAden*, 148 N. Car. 10, 12; *S. C.*,
150 N. Car. 206, 209, 210.   That such was the law prior
to the adoption of the Code of Civil Procedure was recog-
nized by the Circuit Court of Appeals (202 Fed. Rep. 41).

The Code of 1855 did contemplate an order or fiat
for registration, and there is no evidence that the Olmsted-
Stevens deed, when registered in 1869, was accompanied
by such an order, except the official certificate that it
was "*duly* registered."   But it has been in effect held
that the statutory provision for such an order is direc-

tory, not mandatory; and that, if the deed be in fact registered after proper probate, the fiat becomes non-essential. *Holmes* v. *Marshall,* 72 N. Car. 37, 40; *Young* v. *Jackson,* 92 N. Car. 144, 147; *Darden* v. *Steamboat Co.,* 107 N. Car. 437, 445. The first two of these cases were distinguished in *Evans* v. *Etheridge,* 99 N. Car. 43, 47; but this case did not hold that the absence of the fiat for registry was fatal.

However, assuming the amendment of 1868 to have a retrospective effect, and to be so construed as to require the certificate of acknowledgment of the Olmsted-Stevens deed to be submitted to the adjudication of the Judge of Probate, and then to the approval of the proper court or judge, and an order for its registration to be made, as conditions precedent to registration, we have next to consider the effect of an act of the General Assembly of North Carolina, ratified January 27, 1870 (Laws 1869–1870, p. 69), and entitled "An Act concerning the probate and registration of deeds and other instruments." Its language is: "*That the probate of all deeds and other instruments required to be registered heretofore taken under laws existing prior to the adoption of the code of civil procedure, is hereby declared valid to all intents and purposes, and shall be admitted to registration as if the probate had been taken under existing laws.*" The form of expression indicates a legislative intent to validate probates theretofore taken in accordance with the requirements of the law as it existed before the Code, including probates thus taken subsequent to the ratification of the Code and before the validating act. (And see *Cozad* v. *McAden,* 148 N. Car. 10, 12, containing a *dictum* to that effect.) But we need not go so far, since it is not and cannot be questioned that the Act validates and admits to registration probates taken before the Code and in accordance with the law as it stood when they were taken. The Court of Appeals, referring to this Act and to a later curative

act ratified December 12, 1876 (Laws 1876–1877, p. 68), and considering their effect upon the registration of the two deeds under which plaintiff claims said (202 Fed. Rep. 48): "There is nothing contained in the foregoing that could be construed to relate to the defects alleged as respects the probate of these deeds. *In this instance there was no probate at all* [italics ours]. Therefore it cannot be said that this act, which undertakes to cure defective probates, can have any relation to instruments attempted to be registered in the manner these were. For that reason we do not think this act applies to the case at bar."

Confining ourselves to the effect of the 1870 act upon the Olmsted-Stevens deed, in our opinion the court erred in holding there was "no probate" of the deed, within the meaning of the curative act.

It is possible that, after the Code of Civil Procedure extended to other cases the requirement of adjudication which before that time had applied only with respect to acknowledgments and proofs taken before specially appointed commissioners, the word "probate" may have come to be used with reference to the act of judicial approval by the Judge of Probate, rather than to the certificate of acknowledgment or proof submitted for such approval.

But the act of 1870 employed the term "probate" with respect to proceedings taken under laws that existed prior to the adoption of the Code of Civil Procedure, and we must look to the prior law in order to determine in what sense the word was used in the curative act. In general usage the term is applied rather to wills than to deeds, and signifies official proof, sometimes *ex parte*, before a judicial or quasi-judicial officer or tribunal. In North Carolina, from an early day, it has been applied to the proof or acknowledgment required to be made of deeds and other instruments in writing as a

condition precedent to registration. In early times, probate was made before the county courts. Laws 1807, ch. 16, p. 10; Laws 1814, ch. 11, p. 12; ch. 19, p. 14. Afterwards, deeds were allowed to be acknowledged or proved "either before one of the judges of the supreme court or of the superior court, or in the court of the county where the land lieth." Rev. Stat. 1837, ch. 37, § 1. And in the Revised Code of 1855, ch. 37, § 2, the clerk of the county court and his deputy were included among those who might take acknowledgments and proofs within the State. Such acknowledgment or proof was frequently referred to as "probate." Thus, we find that Chapter 21 of Rev. Code 1855, under which the commissioner who took the acknowledgment in question was appointed, has for its title "Commissioners of Affidavits and *Probate of Deeds.*" The index at the head of the chapter and the index-note in the margin read: "Governor may appoint commissioners to take and certify *probate* of deeds &c. in other States." And so with respect to Chapter 37: the word "probate" is employed in the head and marginal indexes with respect to §§ 4 and 5, and is also employed in the body of § 5. In short, the word appears to have been commonly employed, prior to the Code of Civil Procedure, as referring to the proof or acknowledgment of deeds as a condition precedent to registration, irrespective of whether it was taken before a court or a commissioner. And it was so employed in judicial opinions. *McKinnon* v. *McLean* (1836), 19 N. Car. (2 Dev. & Bat.) 79, 83–86; *Carrier* v. *Hampton* (1850), 33 N. Car. (11 Ire.) 307, 310; *Freeman* v. *Hatley* (1855), 48 N. Car. (3 Jon.) 115, 117–119; *Williams* v. *Griffin* (1856), 49 N. Car. (4 Jon.) 31, 32; *Johnson* v. *Pendergrass* (1857), 49 N. Car. (4 Jon.) 479, 480; *Simmons* v. *Gholson* (1858), 50 N. Car. (5 Jon.) 401, 403.

Indeed, this meaning of the term "probate" is recognized in § 429 of the Code of Civil Procedure itself, for

this requires that deeds "must be offered for probate, *or a certified probate thereof must be exhibited* before the Judge of Probate;" and, in going on to specify the manner of doing this, it treats the certificate of acknowledgment or proof as the certified probate thus required to be exhibited.

To construe the act of 1870 as applying only to proceedings such as were first prescribed by the Code of Civil Procedure would leave it nearly or quite devoid of force. The things to be validated were probates taken under laws that existed prior to the adoption of that Code. We cannot limit this to proceedings that would be deemed probate under the test adopted by the Code itself, for these would require no validation. And in *Cozad* v. *McAden,* 148 N. Car. 10, 12, the Supreme Court of North Carolina, *arguendo,* construed the act of 1870 as dispensing with the adjudication by the Judge of Probate and "making probates in the previous manner valid up to 27 January, 1870."

We deem it equally clear that the effect of the curative act is not confined to deeds that remained unregistered. With regard to these, it contained a legislative fiat that they should be admitted to registration. But, certainly, it was not intended that similar deeds already registered should stand on a less favorable footing. On the contrary, the intent is that all deeds probated in such manner that under the previous laws they were entitled to be admitted to registration, shall be validated "to all intents and purposes." The result is that if already registered when the act of 1870 was ratified the legislative fiat for registration, which took the place of the judicial fiat, applied to them *nunc pro tunc.* Considering the change in the law that had been produced by the then recent act of 1868, and the confusion naturally attributable to it, we think the construction we have placed upon the act of 1870 correctly expresses the legislative purpose.

The result of this is that, at least from the ratification of the curative act, the Olmsted-Stevens deed became "good and available in law," and notice to all the world, including those under whom defendant claims.

The Court of Appeals (202 Fed. Rep. 42) said: "It was not contended by counsel for the plaintiff in the court below that the attempted registration of the deed from Olmsted to Stevens was sufficient to divest Olmsted of the legal title." If by this it was meant that counsel did not assert whatever rights plaintiff had under the registration of 1869, or waived any rights so asserted, or did not fairly except to the adverse rulings of the trial court upon the question, we cannot agree. The first exception (taken when the Olmsted deed was offered and the court excluded from evidence the registration of 1869) shows that, in response to an inquiry from the court, "Upon which registration are you offering the deed?" plaintiff's counsel answered, "Both." And in the ensuing colloquy the court stated the respective positions of opposing counsel as follows: "He [meaning plaintiff's counsel] says that I am offering a deed registered in 1868 [meaning 1869], and also one which we say was registered in 1896. Defendant's counsel says this deed registered in 1868 [1869] cannot be accepted, as it is not legally registered and is void." And plaintiff's exception was: "To the ruling of the court excluding the record offered in evidence of the registration of the deed in 1869." It is true that after the court had ruled this point against plaintiff, and after the introduction of defendant's evidence, plaintiff again offered the record of the registration of 1869, "not for the purpose of showing title [that purpose had already been overruled] but as evidence of notice to the purchasers, simply as a circumstance giving notice." This did not amount to a waiver of the point previously reserved. Besides, at the close of all the evidence, plaintiff asked for certain instructions based in effect upon the

1869 registration, and took exceptions to the action of the trial judge in refusing these and in instructing a verdict for defendant. The question we have passed on was clearly reserved by the exceptions.

The deed from Olmsted to Stevens, its probate, and its registration in Clay County in 1869, having been validated "to all intents and purposes" by the act of 1870—long prior to the derivation of defendant's title from Olmsted—we must next consider the deed from Stevens to the United States. For, of course, plaintiff must succeed on the strength of its own title, and the latter deed is an essential link in the chain.

This deed stands upon a different footing from the Olmsted deed, for it was both made and acknowledged after the ratification of the Code of Civil Procedure in 1868, and it was not registered in Clay County within two years after its date, nor until sometime in 1896, being then accompanied with certificates of probate that complied with the provisions of the Code of Civil Procedure. It was acknowledged before the act of January 27, 1870; but, supposing that Act to be applicable to deeds acknowledged after the adoption of the Code of Civil Procedure, and in a mode not conforming to its provisions but conforming to the provisions of the previous law, it cannot avail plaintiff because it did not dispense with the necessity of registration within two years from the date of the deed, imposed by Rev. Code, 1855, chap. 37, § 1.

Nor do we think the deed comes within the act of December 12, 1876, for it was not registered within two years after the ratification of that Act, as by its terms was required.

As we have already seen, Rev. Code 1855, ch. 37, § 1, declared that no conveyance of land should be "available in law" unless registered in the county where the land lay, within two years after its date. Prior to the Connor Act of 1885, presently to be mentioned, it was settled law in

North Carolina that an unregistered deed could not be
introduced in evidence and did not create a perfect legal
title. It was sometimes treated as an executory contract
between the parties, sometimes as conferring an equitable
title, or an incomplete legal title; the difference is immate-
rial for present purposes. Unless registered within the
two years allowed by the Code of 1855, or as allowed by
statutes extending the time, of which there were many
but none that applies here, the deed was not "available in
law." On the other hand, when recorded within the time
allowed by any act of the legislature, it related back to
the time of its execution, and conveyed a complete legal
title as of that date, which was paramount even to the
title acquired by a purchaser for value from the same
grantor without notice of the unregistered deed. *Phifer*
v. *Barnhart* (1883), 88 N. Car. 333, 338, and cases cited;
*Austin* v. *King* (1884), 91 N. Car. 286, 289; *Laton* v.
*Crowell* (1904), 136 N. Car. 377, 379.

But by § 1 of the Connor Act—chap. 147, Pub. Laws
1885—§ 1245 of the Code of 1883 was struck out (this had
taken the place of Rev. Code 1855, chap. 37, § 1), and in
its place the following was inserted:·

"No conveyance of land . . . shall be valid to
pass any property, as against creditors or purchasers, for
a valuable consideration from the donor, bargainor or
lessor, but from the registration thereof within the county
where the land lieth: *Provided however*, that the provisions
of this act shall not apply to . . . deeds already
executed, until the first day of January, one thousand
eight hundred and eighty-six: *Provided further*, that no
purchase from any such donor, bargainor or lessor shall
avail or pass title as against any unregistered deed ex-
ecuted prior to the first day of December, one thousand
eight hundred and eighty-five, when the person or persons
holding or claiming under such unregistered deed shall
be in the actual possession and enjoyment of such land,

either in person or by his, her or their tenants, at the time of the execution of such second deed, or when the person or persons claiming under or taking such second deed, had at the time of taking or purchasing under such deed actual or constructive notice of such unregistered deed, or the claim of the person or persons holding or claiming thereunder."

By § 2, provision was made for registering deeds executed prior to the year 1855 upon special proof. And, by § 3, all other deeds, having been acknowledged or proven in the manner prescribed by law, were permitted to be registered, "and all deeds so executed and registered shall be valid, and pass title and estates without livery of seizin, attornment or other ceremony whatever."

Under this Act, as has been uniformly held by the Supreme Court of the State, there is no limitation as to the time when the deed shall be registered; the Act simply provides that the deed shall not be valid against creditors or purchasers for value except from registration. *Hallyburton* v. *Slagle*, 130 N. Car. 482, 484; *Cozad* v. *McAden*, 148 N. Car. 10, 11; *Brown* v. *Hutchinson*, 155 N. Car. 205, 208.

Therefore, the registration of the deed from Stevens to the United States in Clay County in 1896 made it valid to pass title as between the parties and for all purposes, unless its effect is limited by what is contained in § 1 of the same Act. But it will be observed that the primary design of that section is to protect "creditors or purchasers, for a valuable consideration *from the donor, bargainor or lessor*" in the unregistered instrument—those, in short, who may be presumed to have relied upon his apparent ownership of the land. And, by the terms of the second proviso, "no purchase from any *such* donor, bargainor or lessor shall avail or pass title as against any unregistered deed [such as the Stevens deed] . . . when the person or persons claiming under or taking *such second deed*, had

at the time of taking or purchasing under such deed actual or constructive notice of such unregistered deed, or the claim of the person or persons holding or claiming thereunder." Stevens made no "second deed." And since defendant and its predecessors in title did not claim under him, but claimed under Olmsted—of whose deed to Stevens they had constructive notice, by reason of its registration in 1869 and the curative act of 1870—it follows that the registration of the Stevens deed in 1896 makes it good as against defendant.

It thus appears that plaintiff's paper title as registered must prevail over that of defendant. This renders it unnecessary to consider whether, aside from the registration of the Olmsted deed in 1869, defendant and those under whom it claims were purchasers without notice, within the meaning of the second proviso of § 1 of the Connor Act. Upon this question, therefore, we express no opinion.

*Judgment reversed, and the cause remanded for further proceedings in accordance with this opinion.*

MR. JUSTICE DAY and MR. JUSTICE HUGHES concur in the result, because, while agreeing with the Circuit Court of Appeals as to its disposition of the case otherwise, they think there was testimony tending to show that Rosenthal was not a purchaser for value, and that question should have been submitted to the jury under proper instructions, since, unless Rosenthal was such purchaser within the terms of the Connor Act, plaintiff was entitled to recover.

MR. JUSTICE McREYNOLDS took no part in the consideration or decision of this case.